# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
### FAYETTEVILLE DIVISION

DONALD HOLMAN                                              PLAINTIFF

      v.             **Civil No. 04-5305**

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY                                         DEFENDANT

## O R D E R

Now on this 6th day of November, 2006, the captioned matter comes on for review, and from the Administrative Record, and the briefs of the parties, the Court finds and orders as follows:

1. Plaintiff Donald Holman ("Holman") is a participant in a Voluntary Long Term Disability Plan (the "Plan") provided by his employer, Tyson Foods, Inc., and insured by Hartford Life and Accident Insurance Company ("Hartford"). Holman was found eligible for disability benefits under the Plan, but later terminated, and now appeals the termination decision.

2. The parties agree that the Plan is governed by the provisions of the Employee Retirement Income Security Act ("ERISA"). Denial of ERISA benefits is "reviewed on a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." **Firestone Tire & Rubber Co. v. Bruch**, 489 U.S. 101, 115 (1989). If the administrator has discretionary authority, its eligibility decisions are reviewed for abuse of that discretion. **Groves v.**

**Metropolitan Life Insurance Co.**, 438 F.3d 872 (8th Cir. 2006).

The Plan here provides that disability benefits become payable when, among other things, the participant "submit[s] proof of loss satisfactory to The Hartford." It also provides that "The Hartford reserves the right to determine if your proof of loss is satisfactory." These types of provisions have been held sufficient to give the claims administrator discretionary authority to determine eligibility, **Ferrari v. Teachers Ins. and Annuity Ass'n, 278 F.3d 801 (8th Cir. 2002),** and the Court will, therefore, review Hartford's benefits decisions for abuse of discretion.

The abuse of discretion standard has been described as follows:

> In applying an abuse of discretion standard, we must affirm if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision. A reasonable decision is fact based and supported by substantial evidence. We may consider both the quantity and quality of evidence before a plan administrator. And we should be hesitant to interfere with the administration of an ERISA plan.

**Groves, 438 F.3d 872, 875** (internal citations and quotation marks omitted).

"Substantial evidence" is "more than a scintilla but less than a preponderance." **Leonard v. Southwestern Bell Corp. Disability Income Plan, 341 F.3d 696, 701 (8th Cir. 2003).**

Although abuse of discretion review puts a heavy burden on a

participant whose benefits have been terminated, it does not amount to "rubber-stamping the result."  A termination decision must be reasonable, i.e., "supported by substantial evidence that is assessed by its quantity and quality."  **Torres v. UNUM Life Insurance Co. of America**, 405 F.3d 670, 680 (8th Cir. 2005).

3.    With the foregoing principles in mind, the Court has examined the Administrative record, from which it has derived the following relevant facts:

* Holman was employed for sixteen years by Tyson Foods, Inc., as a maintenance technician, repairing plant machinery.  He is in his 60's and has a tenth grade education.

* Holman was a participant in Tyson's Voluntary Long Term Disability Plan (the "Plan"), which was insured under Hartford's Group Insurance Policy GLT-43193 (the "Policy").  Hartford is both the insurer and the claims fiduciary for the Plan.

* Page 2 of the Plan Booklet-certificate states that "[t]his plan which you have purchased is designed to help you protect your greatest asset, your ability to earn an income." Page 4 states that "[t]his plan of Long Term Disability Insurance provides you with income protection if you become disabled."

* The Plan pays disability benefits if a participant

becomes "Totally Disabled" while insured; remains Totally Disabled throughout and beyond the Elimination Period; is under the "Regular Care of a Physician"; and submits "proof of loss satisfactory to The Hartford."

* Benefits under the Plan accrue "as of the first day after the Elimination Period," and cease on the occurrence of one of six defined events. The relevant event, for our purposes, is "the date you are no longer Disabled."

* The "Elimination Period" is described as "the period of time you must be Totally Disabled before benefits become payable. It is the first 3 consecutive months of any one period of Total Disability."

* Insofar as relevant to Holman's case, the Plan defines "Totally Disabled" to mean that during the Elimination Period and for the next twelve months, the participant is "prevented by . . . sickness . . . from performing the essential duties of your occupation" (the "own occupation" test). After that, a participant is Totally Disabled if he is "prevented from performing the essential duties of any occupation for which you are qualified by education, training, or experience" (the "any occupation" test).

* In April, 2000, Holman began to notice headaches and

blurred vision.  He consulted Vincent Runnels, M.D., a neurosurgeon, on April 24, 2000.

* On May 1, 2000, Holman underwent a cranial MRI, as a result of which he was diagnosed with a "Chiari malformation[1], with 1 cm of cerebellum tonsil[2] herniation through the foramen magnum[3]."

* Dr. Runnels referred Holman to Ossama Al-Mefty, M.D., a neurosurgeon with special expertise in treating Arnold-Chiari malformations.  On August 28, 2000, Dr. Al-Mefty[4] wrote Dr. Runnels, reporting that an MRI of Holman's head "reveals evidence of a Chairi I malformation with tonsils herniated down to the C1 arch." Dr. Al-Mefty wanted Holman to obtain an MRI of his cervical spine. The letter reported that Holman "feels that he is

---

[1]Stedman's Medical Dictionary, 26th edition (the source of all medical definitions in this opinion) defines Arnold-Chiari malformation as "malformed posterior fossa structures resulting from caudad traction and displacement of the rhombencephalon caused by tethering of the spinal cord."  The rhombencephalon is a part of the brain.
    A medical explanation of the condition from Robert I. Grossman & David M. Yousem, Neuroradiology: The Requisites 436 (2003) is cited in Lawson v. U.S., --- F.Supp. --- 2006 WL 2819833 (D.Md. 2006), to-wit: "This congenital abnormality is characterized by the underdevelopment of the bone at the base of the skull (posterior cranial fossa) and overcrowding of the normally developed hindbrain.  As a result of the underdevelopment of the posterior cranial fossa and overcrowding of the hindbrain, individuals with this abnormality have a larger than normal opening at the base of the skull (foramen magnum), which permits the hindbrain/cerebellar tonsils to protrude, or herniate, into the spinal canal.  The herniation of the hindbrain happens at birth or shortly thereafter.  In its pure form, a Chiari I malformation shows the cerebellar tonsils down to the C1-C2 region, with normal brain stem location."

[2]The cerebellar tonsils are portions of the undersurface of the cerebellum.

[3]The opening at the base of the skull through which "the spinal cord becomes continuous with the medulla oblongata."

[4]This letter was dictated by Robert Strang, M.D., but it is clear that Dr. Strang was reporting the findings of Dr. Al-Mefty.

relatively asymptomatic at this point.  His biggest problem right now is the headaches." The letter noted "nystagmus[5] with left lateral gaze and 1-2 beats of down beat nystagmus[6]," and "mild unsteadiness with tandem gait[7]."  Dr. Al-Mefty discussed the surgical procedure, "Chiari decompression," with Holman, who "wishes to think about this before he makes a decision regarding surgery."

* On May 14, 2001, Holman underwent a cervical spine MRI. It was reported as showing "a Type I Arnold Chiari malformation" with "mild cortical atrophy[8]."

* On May 15, 2001, Dr. Runnels wrote a "To Whom It May Concern" letter stating that Holman "is under my professional care and should remain off work until further notice.  I am sending him to Little Rock to see Dr. Al-Mefty for possible brain and cervical surgery."

* May 16, 2001, was Holman's last day to work at Tyson.

* Following a consultation with Holman on May 17, 2001, Dr. Runnels completed an Attending Physician's Statement ("APS"), noting that Holman's primary diagnosis was

---

[5] Rhythmical oscillation of the eyeballs.

[6] A type of nystagmus occurring with lesions of the lower part of the brainstem or cerebellum.

[7] While the significance of this finding is unclear, Hartford associated it (in a file review dated 1/27/03) with the Arnold-Chiari malformation.

[8] Atrophy refers to a wasting of tissues or organs.

Arnold-Chiari malformation, referencing "my dictated summary," and stating that Holman was "disabled, possibly permanently!" In the section of the form asking for patient ability to perform such functions as walking, sitting, lifting, etc., Dr. Runnels noted "the patient would need to have a functional capacity evaluation to determine these answers." In the area of the form dealing with psychiatric impairment, Dr. Runnels checked the box beside the statement "Major impairment in several areas - work, family relations. Avoidant behavior, neglects family, is unable to work."[9]

*   On May 18, 2001, Dr. Runnels wrote Dr. Al-Mefty, noting that he had been following Holman for his Arnold-Chiari malformation, and that Holman had "seen Dr. Kyle[10] who did not want to operate at this time." Dr. Runnels stated that as of May 8, 2001, Holman "was still complaining of occipital[11] headache, which radiates to his forehead. He has numbness in his thumb and next two fingers. He notes spells of decreased vision although I could not detect anything on my examination." Dr.

_____

[9]The Court agrees with the Hartford claims examiner who stated, in a May 29, 2003, entry in the Summary Detail Report, that Dr. Runnels "apparently . . is only trying to communicate that he considers Mr. Holman disabled from his Arnold-Chiari rather than that he has psychiatric problem [sic], which are not otherwise noted."

[10]The Court believes this is a reference to Kyle Hardy, M.D., who did the pulmonary work-up to determine if Holman was a candidate for surgery.

[11]Headaches in the back of the head.

Runnels suggested obtaining cranial and cervical MRIs to refine the diagnosis.

* On May 21, 2001, Dr. Runnels wrote Dr. Al-Mefty, stating that Holman had returned to see him on May 15, and was "still having the cough headaches as well as some neck pain."  He had sent Holman for cervical spine x-rays, and considered that Holman might need neck surgery as well as surgery for the Arnold Chiari malformation.  He stated that he thought Holman "will be unable to work for at least one year and should be granted short-term disability. At the end of one year, though, we can reevaluate him."  The letter stated that Dr. Runnels would like to get Dr. Al-Mefty's "opinion about the knee [need] for a posterior fossa decompression."

* On May 29, 2001, Dr. Runnels wrote Dr. Al-Mefty, noting that he was sending Holman "down to see you for evaluation of his Arnold-Chiari malformation with symptoms of cough headache."  He also stated that Holman "would like to quit smoking" and that he had been referred to a pulmonologist.

* On August 20, 2001, Dr. Al-Mefty wrote Dr. Runnels, stating that Holman "is still having episodes of headaches after coughing associated with blurry vision for about 45 seconds."  He noted that Holman was trying

to stop smoking in preparation for surgery to correct the Arnold-Chiari malformation.  At some point after August 20, 2001, Dr. Al-Mefty completed an undated APS, indicating a diagnosis of Chiari I malformation, and an MRI showing herniated tonsils down to the C1 arch.  He noted physical examination findings of nystagmus with left lateral gaze, and mild unsteadiness with tandem gait.  He crossed out the section of the form inquiring about physical impairments and wrote "N/A" over it.

\* On November 27, 2001, Dr. Runnels wrote Dr. Al-Mefty, noting that Holman had been "cleared for surgery," and was hopeful to have it performed before the year was out, while he still had insurance.

\* On December 13, 2001, Hartford notified Holman that his benefits were being terminated because "the medical evidence does not render you Totally Disabled throughout and beyond the Elimination Period."  The letter pointed out that under the Plan, benefits were payable if Holman's disability prevented him "from performing the essential job duties of your occupation as a Maintenance employee throughout and beyond the Elimination Period," and noted that the Elimination Period ran from May 17, 2001 through August 15, 2001.  The letter stated that "there is no medical information or specific

restrictions and or limitations to support why you were able to work full time 4/24/00 through 5/16/01 with the current diagnosis you are now claiming disability why you are now unable to work."

* On December 18, 2001, Hartford contacted Dr. Runnels and "posed [a] question" to him, apparently about how Holman's condition affected his ability to work. Dr. Runnels "suggested to familiarize myself with Arnold Chiarie's [sic] malformation and that should answer any of the questions that I have."

* On December 19, 2001, the Summary Detail Report in the record indicates that Hartford obtained input on Holman's case from a consultant, Dr. Lyon, who "confirmed the seriousness of the dx[12] and the neurological symptoms and sequalae [sic] of potential death. The MRI showed that the herniation had increased, any lifting, pushing or pulling associated w/valsalva[13] would increase his symptoms ie: increase intracranial pressure and therefore cause further complications and potential death." Later that same day, "Dr. Lyon said he did some more research and that

---

[12]The Court believes this abbreviation refers to "disease," given the context of the quoted material, although "dx" is a common abbreviation for "diagnosis."

[13]A Valsalva maneuver is "any forced expiratory effort ("strain") against a closed airway, whether at the nose and mouth or at the glottis." The glottis is part of the vocal apparatus of the larynx.

any valsalva maneuver such as lifting, pushing, pulling etc, needed for his job would cause the insured to become symptomatic and cause severe/critical complications to the insured's medical condition." Still later that day, "The insured is neurologically symptomatic when he coughs (Valsalva) which is consistent with the seriousness of his diagnosis. His dx most likely could progress and lead to death if not treated. Surgery is complicated and carries a high death rate."

*   On December 20, 2001, the Summary Detail Report noted that "Dr. Lyon confirmed the seriousness of the dx and the neurological symptoms and sequalae [sic] of potential death. The MRI showed that the herniation had increased, any lifting, pushing or pulling associated w/valsalva would increase his symptoms ie: increase intracranial pressure and therefore cause further complications and potential death . . . the EE's[14] essential job duties do require physical labor crouching, crawling, standing and lfting [sic] up to 25 lbs and operating hand tools with the EE's symptoms that cause EE to become blurred vision and severe headaches . . . ." Hartford notified Holman that day that his

---

[14]Abbreviation for "employee."

claim for long term disability benefits ("LTD") had been approved, effective August 15, 2001.[15]  The letter pointed out that after August 15, 2002, in order to qualify for benefits Holman would have to be prevented from performing the essential duties of any occupation for which he was qualified by education, training or experience.

\*      On February 21, 2002, Hartford wrote Holman, notifying him that, because he had become eligible for benefits on August 15, 2001, "[e]ffective 8/15/02 you must be considered totally disabled" according to the "any occupation" test of the Policy.  The letter went on to advise Holman "that this office has initiated an investigation to determine if you will qualify for benefits on and after 8/15/02.  When we have completed our investigation, we will notify you regarding our determination."

\*      On March 1, 2002, Dr. Runnels completed an APS in which he indicated that Holman "is awaiting surgery from Dr. Al-Mefty" for Arnold-Chiari malformation and that the date upon which he would be released to return to work

---

[15]One may be forgiven for wondering how this decision squares with Hartford's December 13, 2001, letter notifying Holman that his benefits were being terminated because "the medical evidence does not render you Totally Disabled throughout and beyond the Elimination Period."  The Administrative Record sheds no light on this curious circumstance.

was "undetermined."

*   On March 29, 2002, Holman completed a Claimant Questionnaire, in which he indicated that he had "unexpected severe headaches that prevent me from working," and that "I never know when the headache will occur." He indicated that there had been no change in his condition for the past 18 months.

*   On May 9, 2002, Hartford wrote Holman, pointing out that it had not received various forms and medical documentation it had requested for use in re-evaluating his claim. On that basis, it had decided to terminate Holman's LTD benefits.

*   Following an examination of Holman on May 30, 2002, Dr. Runnels completed an undated APS showing a primary diagnosis of Arnold-Chiari, for which the treatment was "post fossa decompression." Dr. Runnels again failed to indicate what, if any, physical impairments Holman had, and again checked the box under psychiatric impairments for "Major impairment in several areas - work, family relations. Avoidant behavior, neglects family, is unable to work." After this statement he wrote "needs brain surgery for Arnold Chiari."

*   On June 11, 2002, Dr. Runnels wrote Dr. Al-Mefty, stating that he had seen Holman on May 31, 2002, and he

"still has cough headaches, etc. He is also troubled
with some impotence.  He has heard about Viagra and
wanted to try it." Dr. Runnels prescribed the Viagra,
along with Holman's regular medications, and counseled
Holman "to be sure to telephone [Dr. Al-Mefty] so that
he stays on track and gets set up for surgery."  He
noted that "I agree that he is disabled. . . . At this
time, he is unable to work until further notice."

*    On July 18, 2002, Dr. Runnels wrote a "To Whom It May
     Concern" note, stating that Holman was disabled from
     Arnold-Chiari malformation and that he had "referred him
     to one of the world's experts, Dr. Al-Mefty," for
     decompressive surgery. The note stated that Holman "is
     disabled until he can get his decompressive surgery,"
     and that he has "retrolisthesis[16] at the two levels
     above his previous [cervical] fusion" which "also
     contributes to his disability."

*    On September 20, 2002, Holman appealed Hartford's
     decision to terminate his benefits.

*    On December 23, 2002, Dr. Al-Mefty wrote Dr. Runnels,
     noting that Holman has "a known Chiari I malformation,"
     "confirmed CSF[17] dynamic disturbance" consistent with

---

[16]A slipping backwards of the vertebrae.

[17]Cerebrospinal fluid.

his diagnosis, and episodes of vertigo[18].

* An entry in the Summary Detail Report on December 30, 2002, notes that "the claimant's treating physician is clearly supporting disability." The Report references a telephone call to Holman that date, in which the claims examiner explained to Holman that "the definition of disability changed in August" (from the "own occupation test" to the "any occupation test"), and that "it is possible the examiner will be able to make a decision regarding the 'own occupation' period, but may need additional investigation in order to make a decision for 'any occupation'."

* In a file review on January 27, 2003, documented in the Summary Detail Report, Hartford noted that the "restrictions and treatment provided through the 11/27/01 office note would suggest and support a lack of functionality. Per Dr. Runnels the claimant would lack functionality until after surgery. . . ." The Summary Detail Report went on to conclude, however, that "[w]hile it appears that the claimant lacked functionality through the 11/27/01 office note there are no records to support a level of impairment that would continue to suggest that the claimant lacked

---

[18]"A sensation of spinning or whirling motion. V. implies a definite sensation of rotation of the subject or of objects about the subject in any plane."

functionality beyond 11/27/01." The reviewer therefore recommended that benefits continue to be terminated effective May 30, 2002.

* On February 12, 2003, the Summary Detail Report fleshed out the January 27, 2003, review, stating "[i]t is the MCCM[19] medical opinion, with reasonable medical certainty, that the claimant's medical work up was appropriate through the 11/27/01 office note. After the 11/27/01 office note the claimant's focus changed from complaints associated with Arnold Chiari Malformation to that of Impotence. The severity and necessity of decompressive surgery is questioned based on the following. 1. The claimant's complaints suddenly changed and his care ended. It is my experience, from reviewing prior claims, that claimant's suffering with severe complications associated with Arnold Chiari Malformation's (ACM), so severe that it requires surgical intervention, undergo medical management recommendations. In the claimant's situation he ceased medical intervention. 2. The claimant's complaints changed from associated symptoms related to ACM to that of impotence. It is unclear how the claimant would be

---

[19]The Court has been unable to determine who these initials refer to, but there is no evidence of an outside file review, or even a file review by a Hartford medical director.

able to physically participate in activities associated with non impotence, if the severity of the ACM precluded functionality to RTW [return to work]. Based on a lack of ongoing medical treatment, and based on the change in the claimant's medical complaints, the records reviewed would not support a lack of functionality beyond 11/27/01."

* On February 13, 2003, Holman was notified by Hartford that his benefits were being terminated effective May 30, 2002, because the medical information in his file "does not support an inability to perform essential duties of your own occupation." This letter also explained to Holman that after twelve months of disability from his own occupation, the "any occupation test" applied to his claim. The letter noted that on his APS, Dr. Al-Mefty "did not indicate any restrictions or limitations that would prevent you from performing your occupation," and that when called, someone in Al-Mefty's office told the Hartford caller that "Dr. Al-Mefty does not complete this type of form." It also noted that Holman stated, during an office visit of 8/28/00, that he felt he was "asymptotic [sic] at this point," and wanted to think about it before having surgery for his condition, then did not follow up until

8/20/01.

* On March 18, 2003, Dr. Runnels signed an APS in which he indicated that Holman would be disabled "permanently" as a result of Arnold-Chiari malformation and cervical spondylosis[20].  An entry dated May 29, 2003, in the Summary Detail Report noted that this APS "is a reiteration of [Dr. Runnels'] opinion that Mr. Holman should be considered disabled; however, there is no evidence to support why."

* On April 21, 2003, Holman appealed the decision to terminate his benefits.  In this letter, he pointed out that he had been declared totally disabled for purposes of receiving Social Security benefits.

* On May 27, 2003, Hartford notified Holman that it had completed review of his appeal, and was still denying benefits because "you are not disabled as defined in the Policy."  It stated that while "it is clear" that - according to Dr. Runnels - Holman "should be considered disabled," there "is no evidence in his office notes, forms or correspondence to support why."  This statement was apparently related to another, that "[a]lthough Dr. Runnels has consistently stated that he considers you disabled pending your surgery, he has not provided

---

[20]Stiffening or fixation of the vertebrae of the neck.

specific information about why you should be considered disabled, i.e., specifically how your activities are limited."  The letter acknowledged that "[o]ur medical investigation previously concluded that with the presence of Arnold-Chiari, in general, activities involving straining may increase your risk of medical complications including death," but went on to state that "[i]t is unclear if there is a legitimate restriction against any type of straining activities in your particular case."  The letter stated that the risk of death did not constitute a disability:  "Because the policy determines disability based on functional or cognitive limitations preventing occupational requirements, the potential risk of medical complications associated with performing work does not constitute a disability, particularly in light of the lack of actual ongoing impairment."  In the letter, Hartford took the position that Holman was "active" because "when our Examiner called your house on 8/21/02 we were told you were performing maintenance on your car."  The letter noted that "[n]ew reported symptoms, such as vertigo in December 2002, are only pertinent to your claim if there is proof of disability from June 2002 to the onset of the new symptoms," and that

Holman's medical records "beyond 5/31/02 do not document that you are having symptoms that are frequent or severe enough to prevent you from working."

4.    The foregoing recitation of evidence from the Administrative Record makes it clear that Dr. Runnels, a neurosurgeon and thus a specialist in the field which treats Arnold Chiari malformation, took the unequivocal position that Holman was totally disabled.  Dr. Lyon, the medical professional consulted by Hartford, agreed.  Holman's condition is such that the essential duties of his occupation would put him at risk for further complications from his condition, up to and including death.   The only treatment for the condition is a surgical procedure which itself has a high death rate.

Set off against this evidence is the failure of Holman's physicians to specify what physical functions he was incapable of performing, and the fact that Holman performed some maintenance on his car and requested a prescription for Viagra.

The Court finds that Hartford's decision to terminate Holman's benefits on this basis was an abuse of its discretion, for the following reasons:

(a)  To find that Holman was not disabled, Hartford had to disregard - without adequate justification - the opinion of Holman's treating physician. While ERISA plan administrators need not "automatically . . . accord special weight to the opinions of

a claimant's physician," they "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." **Black & Decker Disability Plan v. Nord**, **538 U.S. 822, 834 (2003).**

(b)  Hartford's decision was based on an almost total failure to investigate Holman's claim.  Although confronted with objective medical evidence of an uncommon condition, and the unequivocal opinion of his treating physician that Holman was disabled, Hartford did not have a neurologist review the claim.  Such conduct was held to be a serious procedural irregularity in **Woo v. Deluxe Corp., 144 F.3d 1157 (8th Cir. 1998)**[21].

(c)  To the limited extent that Hartford did investigate Holman's claim, what it learned was consistent with the opinion of Holman's treating physician and inconsistent with a decision to terminate benefits: Dr. Lyons told the claims examiner that Holman's condition was serious and continuation at his job was life-threatening.

(d)  Hartford misinterpreted a relevant provision of its own Policy.  The Policy does not, as asserted in Hartford's May 27, 2003, termination letter, "determine[] disability based on functional or cognitive limitations preventing occupational

---

[21]This procedural irregularity in <u>Woo</u> was found to justify less deferential review of the plan administrator's decision, for which Holman here contends as well.  Because the Court finds that even with fully deferential review, Hartford's decision in this case cannot stand, it has not undertaken the <u>Woo</u> analysis to determine whether or not less deferential review is warranted.

requirements." It defines "Totally Disabled" as a condition which exists when a participant "is "prevented by . . . sickness . . . from performing the essential duties of your occupation." Holman's doctor - and Hartford's own consultant - established that Holman's condition prevented him from performing his job. The interpretation applied by Hartford is inconsistent with the stated goal of the Plan (to "help you protect your greatest asset, your ability to earn an income") and would render the definition of Totally Disabled meaningless in a case such as Holman's, where what prevents him from working is not an inability to perform the actual functions, but the risk that performing them will kill him. It is, therefore, an unreasonable interpretation.

(e) It was not necessary to a finding of disability for Holman's doctors to list particular physical functions that he could not perform, in the fashion commonly seen on standardized forms for evaluating functional capacity, where an evaluator estimates the length or amount of time a patient can sit, stand, walk, etc. Hartford's own reviewer concluded, on January 27, 2003, that the restrictions imposed by Holman's doctor as of November 27, 2001, "would suggest and support a lack of functionality." There is no evidence that Holman's condition abated or improved after that date.

(f) The fact that Holman performed some form of maintenance on his vehicle, and the fact that he obtained a prescription for

Viagra, are not probative. Neither simple auto maintenance nor sexual activity is shown to necessarily involve exertions that would put Holman at the same risk his job would entail.

(g)  The frequency or severity of symptoms in this particular case is not dispositive.  For Holman, it was not merely the fact that he had headaches, blurry vision, and vertigo that impaired his ability to work.  The additional - and more important - consideration was that these events were symptomatic of a condition which placed Holman at risk of death when carrying out his job duties.  Disability may be posited upon the risk of worsening a known condition.  **Herring v. Canada Life Assurance Co.**, **207 F.3d 1026 (8th Cir. 2000)**.

As noted in paragraph 2, the reasonableness or "unreasonableness of a plan administrator's decision can be determined by both the quantity and quality of the evidence supporting it." **Torres**, **405 F.3d at 680**.  Here, neither the quantity nor the quality raises above the "scintilla" mark, and the Court finds that no reasonable person would have reached the same decision Hartford reached in this case.  It was, therefore, error for Hartford to terminate Holman's benefits as of May 30, 2002, and he is entitled to benefits from that date until August 15, 2002.

5.  Because Hartford's decision was that Holman was not disabled from performing his own occupation, the Court has

considered whether it is appropriate to remand this matter for further consideration of whether Holman could – after August 15, 2002 – perform the essential functions of any occupation for which he is reasonably fitted by education, training or experience. Ordinarily, it is for the plan administrator to make such a decision in the first instance, as courts should avoid becoming "substitute plan administrators," **DuMond v. Centex Corp.**, **172 F.3d 618 (8th Cir. 1999),** but the Court finds that this case presents a special situation in which such remand is not appropriate.

Hartford's administrative review of Holman's claim took place with full knowledge on Hartford's part that the issue of Total Disability was governed by the "any occupation" test. Hartford repeatedly explained to Holman that this test, rather than the "own occupation" test, applied after August 15, 2002. Indeed, a determination of whether Holman met the "any occupation" test was the very purpose of the investigation into Holman's claim that was commenced in February, 2002 (six months before the point at which the new test would even become applicable). Notwithstanding this, Hartford chose to base its decision on Holman's ability to perform the essential functions of his own occupation.

This is not a case where subsequent to an administrative decision a court finds that the administrator was mistaken about the proper standard, corrects that mistake, and then sends the matter back for the application of the proper standard. Here,

Hartford chose to ignore the very standard it claimed to be applicable. To send the matter back to Hartford at this point would essentially give Hartford two bites at the apple, while penalizing Holman - by subjecting him to yet another round of administrative decision-making and review - because Hartford chose not to base its review on what it recognized as the applicable standard. "[T]he concepts of judicial economy, prompt adjudication of claims, and fundamental fairness to claimants require that all defenses or objections to pension claims be considered by the pension plan trustee prior to federal court review. Multiple reviews and remands are costly and lengthy, both for the claimants and the courts." **Bruce v. K-Mart Corp.**, **568 F.Supp. 378, 384 (D.C. Ark. 1983)**. Holman would not be granted such leeway, had he failed to present evidence at the administrative level. **Davidson v. Prudential Insurance Company of America**, **953 F.2d 1093 (8th Cir. 1992)**. Thus, fundamental fairness counsels against remand.

In spite of the foregoing, if the record were devoid of facts upon which to base an "any occupation" decision, the matter would have to be remanded. Based on the facts now before it, however, the Court considers it unlikely that Hartford could reasonably find Holman not disabled under the "any occupation" test. It would have to show that Holman could, after August 15, 2002, have performed the essential functions of some occupation for which he was "qualified by education, training or experience." In August,

2002, Holman was 61 years of age.  He had a tenth grade education, and his relevant work experience was limited to his maintenance technician job at Tyson.  Thus the range of jobs for which he might be found qualified was very small.  He had a serious medical condition which caused him blurred vision, vertigo, and unsteadiness on his feet. He had a secondary, potentially disabling condition, the retrolisthesis.  His treating neurosurgeon, and Hartford's own consultant, had opined that he was unable to work, and Hartford had already interpreted Dr. Runnels' opinions as meaning that Holman would "lack functionality until after surgery."  It can thus be seen that Holman had very significant impairments that would further limit the work that he might be able to perform. Holman has been found disabled by the Social Security Administration, which, while not determinative, is further evidence that Holman is disabled from any occupation. **Riedl v. General American Life Ins. Co.**, **248 F.3d 753, fn. 4 (8th Cir. 2001).**

Under these circumstances, a remand would put both Holman and Hartford to considerable, and probably needless, expense.  The evidence is so one-sided in favor of a finding of disability under even the "any occupation" test that the  Court deems it the proper course of action to resolve the matter here, by finding that Holman was disabled from both his own and any occupation for which he was qualified, from August 15, 2002, through the end of the

maximum period of eligibility.[22]

6.    In addition to his claim for unpaid benefits, Holman prayed for an award of costs and attorney's fees.  The Court has discretion to award reasonable attorney's fees and costs to either party in an ERISA action, under **29 U.S.C. §1132(g)(1)**.  Such an award in favor of Holman is merited in this case, conditioned upon submission of an appropriate petition therefor within fourteen (14) days of the date of this Order.  Hartford will have eleven (11) days thereafter to lodge any objections to the petition.

**IT IS THEREFORE ORDERED** that the decision of Hartford Life and Accident Insurance Company, finding Donald Holman not disabled for purposes of the Tyson Foods, Inc., Voluntary Long Term Disability Plan, is **reversed.**

**IT IS FURTHER ORDERED** that the parties confer and file, within twenty (20) days of the date of this Order, either (a) an agreed statement of the amount of past-due benefits owed to Holman from May 30, 2002, until the last date benefits would have been payable to him under the Maximum Duration Of Benefits Table contained in the Booklet-certificate for Hartford Group Insurance Policy GLT-43193, or (b), should they be unable to agree on this amount, position papers setting forth their respective positions on that issue.

---

[22]Based on Policy provisions not herein relevant, it appears that Holman's eligibility for benefits would have terminated under any circumstances no later than August 15, 2006.

**IT IS FURTHER ORDERED** that Holman is entitled to a reasonable attorney's fee, conditioned upon presentation of an appropriate petition for same within fourteen (14) days of the date of this Order.  Hartford will have eleven (11) days from such filing to state any objections thereto.

**IT IS SO ORDERED.**

**/s/ Jimm Larry Hendren**
**JIMM LARRY HENDREN**
**UNITED STATES DISTRICT JUDGE**
